Let's move on to the next case of the day, which will be Gates v. Chicago Board of Education. We'll hear first from Ms. Galovich. Good morning. May it please the court, my name is Luann Galovich and I represent the plaintiff appellant. There are two issues before you for consideration today. The first is whether the district court erred in ruling that the plaintiff failed to present sufficient evidence that he was subjected to a hostile work environment. And the second is whether the district court erred in ruling that the plaintiff failed to present sufficient evidence that he was subjected to retaliation. The issues between the parties in summary judgment were primarily whether the plaintiff suffered an adverse employment action. That's what it all seemed to boil down to. As this court is aware, there are three categories of actionable adverse employment actions. One being termination or reduction in force. Two, a transfer or a change in your job duties. And three, some unbearable changes in job conditions such as hostile work environment. You can show hostile work environment and there's four requirements. Harassment based on membership in a protective class, of which Mr. Gates is African American. And the basis for employer liability, which he's an employee who was harassed by his supervisor. So the court didn't cover those in the opinion below. Rather, it moved on to whether harassment is based on membership, I'm sorry, whether the work environment was objectively and subjectively hostile. I think we can all agree subjectively hostile is how the plaintiff perceives the treatment that he was receiving. Plaintiff received racial slurs towards him. His work conditions became deplorable. And he believed that he was discriminated against. Let me ask you, on the hostile environment claim, we're talking about three incidents spread out over several months. What does the record tell us about how often plaintiff was at work during those months and how often he encountered Mr. Rivera? Well, as a board engineer, Mr. Rivera, well, Mr. Gates was supervised by Mr. Rivera. But Mr. Rivera was not at the work site. Rather, he would show up from time to time to meet with Mr. Gates and to check on what Mr. Gates was doing. You know, the number of times is uncertain, but he was his supervisor and he was responsible. But during those months, wasn't Mr. Gates on leave a fair amount? There was quite a bit of leave, mostly December, January. There were some medical issues. 2011, correct? This is 2013 into 2014. Okay. So he had time off, one of which was a medical leave of absence for himself, which was as a result of the stress that he had experienced after the hostile work environment began. Well, the way I kind of add it up, he was basically there 11 days in that period of time. And for four different types of leaves. Is that correct? I'm sorry. You said 11 days. What was that, Your Honor? No, that's a number we came up with. But you may know I have a different number. But he wasn't there very much during that period of time. No, Your Honor. He was not. Four different reasons for leaving, right? Well, two of the major reasons for leave were he was hospitalized for having homicidal thoughts. I want to look at that one, okay? Because that, to me, and I don't know that that was emphasized very much, but homicidal thoughts, I guess that means you're contemplating wanting to kill somebody. Yes, Your Honor. And I assume that person might have been Rivera. Yes, Your Honor. It was Mr. Rivera. Now, what leave was it that he took to have that problem addressed or maybe cured? That was in December of 2013. What? In December 2013, he took that leave. And how long of a leave was that? I believe that was approximately a month. One month. Okay. Well, I didn't see a lot mentioned in that, and that sort of struck me as a rather unusual problem that someone thinks you've got to take a leave and get treatment for. Homicidal, what is it, homicidal thoughts? Okay. All right. That clears it up. I know it took three others. I think there was a military and there was a family leave sometime. Yes, I believe his father may have passed away, and I believe he had military leave. He is a member of the National Guard. And then a workers' compensation leave, whatever that is. Pardon me? Workers' compensation leave. Yes, Your Honor. He was injured on the job. So there are four of them, medical leave, FMLA leave, military leave, and workers' compensation leave. So I guess the medical leave is the one we're talking about to treat the homicidal thoughts. Yes, Your Honor. One month. Yes. All right. During that time, he was hospitalized. He received medication and counseling. He voluntarily submitted himself to treatment because he did not want to do anything improper. But he was that stressed by everything that was happening. As you can see from the record, the comments that were made to him were on approximately August, September of 2013. He had met with Mr. Rivera on one of the occasions when Mr. Rivera came to the school. And Mr. Rivera thought he would be, you know, gave a joke. And he passed gas, and he said to Mr. Gates, he says, oh, what do you call that? Mr. Gates, I don't know. And he says, shit, that's a shit-sniffing nigger. And it wasn't so much that it was a joke. It was he's passing gas, and now he's trying to use this and call Mr. Gates by the N-word. You know, and Mr. Gates reported that behavior to Mr. Rivera's supervisor, Bilkus Jacobel, and told her what was happening, and that he was having problems with Mr. Rivera. Was that encountered during one of the 11 days we're talking about? That might have been prior to the 11 days. Because August to November, I believe he was at work. And then it was after November that a lot of leaves started to take place. November 19th was the threat to, quote, write up your black ass. That's the evidence. And that's when he began taking the leave. Yes, Your Honor. Shortly after that. Okay. So he told him to write up your black ass. Then when Mr. Gates came back from leave in approximately March of 2014, he met with Mr. Rivera, and they were in the library. And Mr. Rivera told him to sit down, and Mr. Rivera declined. Or Mr. Gates declined. And that's when Mr. Rivera... You wanted him to sit down, and he didn't want to sit down? He didn't want to sit down at that time. He wanted to stand. And Mr. Rivera told him to sit again. And Mr. Rivera told Plaintiff, I'm tired of you people. And Plaintiff said, I just don't want to do it. I just don't want to sit down. And Rivera said, nigger, you know what I'm talking about. And then wrote him up for insubordination. Ms. Galevich, on the retaliation claim, I looked in your district court brief for an argument that retaliation came in the form of hostile environment. I didn't really see that in your district court brief. Did I miss that? I believe it wasn't as clear as we had hoped it would be. What's the clearest expression of it? Well, we mentioned there were three sections, sections A, B, and C. And in section A, that was describing the hostile work environment. And then in section B, we discussed the retaliation. And the retaliation, we just conveyed what had occurred with Jacob Bilkis. I see retaliation based on failure to promote or hire and complaints to the union and Bilkis, Jacob L. Yes, Your Honor. I don't really see a hostile environment argument. No, Your Honor, that was not in section B. Okay. Thank you. Thank you. What's your best authority on facts like this where you have a few comments, undeniably terrible comments, that they can rise to the level of constituting a hostile work environment? Well, there is a case of Sears v. Steel Tax where Judge Dow even acknowledged that while there is no magic number of slurs that indicates hostile work environment, an unambiguously racial epithet falls on the more severe end of the spectrum. Can I ask? It's more of a weighing. Well, let me just raise a concern with you that I want to raise with the Board's lawyers as well, which is that in the district court's discussion of the lines of cases dealing with hostile environment based on racial and comparable epithets, what I didn't see was any acknowledgement of the difference between use of such language by coworkers and use of such language by supervisors directly to the person who's being attacked. And in particular, for example, Rogers v. Western Southern Life Insurance, our recent Robinson v. Perala's case involving the University of Illinois here in Chicago, and Johnson v. Advocate Health, we have repeatedly noted that when a supervisor uses such racially toxic language, that's treated much, much more seriously than when coworkers are doing so. Yes, Your Honor. And I didn't see that in the district court's analysis. I didn't see that in the district court's analysis either. We tried to put forth in our brief that because Mr. Rivera was a supervisor and he had control over Mr. Gates' performance appraisals, and we've seen this in the past in other matters, but you have this supervisor and he's spreading this toxic environment. There's the example of Mr. Gregory McCarthy. I mean, the court didn't even raise Mr. McCarthy in its decision. I mean, Mr. McCarthy gave a deposition in our case where Mr. Rivera was at his school and called Mr. McCarthy a nigger. Do you want to save the rest of your time for rebuttal? Yes, Your Honor. We're not going to be quite as loose on the clock as I was on the first case. Ms. Louder for the Chicago Board of Education. May I please report, Your Honor, Ashley Seals for the Board of Education of the City of Chicago. What's your name? Ashley Seals. Okay. We have Lee Louder listed. Okay. You're speaking for the Chicago Board. That's fine. We are asking that this court affirm summary judgment because plaintiff cannot establish that he was subjected to a hostile work environment. We also ask that the court find that plaintiff has waived his retaliation claim by presenting arguments before this court that were not presented before the district court. One of the main issues with plaintiff's case is that he hasn't cited to any case law in support of his argument other than an attempt to distinguish his set of facts from two cases cited by the district court. One of those cases is actually pretty indistinguishable from the facts of his case. In the Shinseki case, that court found that three racial slurs and comments based upon plaintiff's gender were not sufficient to establish that his work environment was sufficiently severe or pervasive. Who were those from? Excuse me? The Shinseki case? Yes. Who were those from? Poulard v. Shinseki. This was a Seventh Circuit case. This was cited by the district court. If you could remind me, who was doing the talking in that case? It was his supervisor who referred to him as a monkey. Are you talking about the Poulard case? Yes. The Poulard case, which I'm pretty familiar with, was dealt with comments that were much more ambiguous. In particular, the monkey reference there was in connection with an article in the Harvard Business Review about, in essence, allocating management responsibility. It's not really comparable to the most toxic racial slur in American culture. Let me just raise with you, Ms. Seale, my concerns about the analysis here. First of all, we have the district court both in quoting the so-called hellish standard for a hostile environment and then relying on a couple of cases that used it when we have expressly and repeatedly rejected the notion that that is the standard that has to be met. For example, in Jackson against Racine and Johnson against Advocate Health. I'm also very concerned, as I indicated a few minutes ago, about the district court's failure to engage with who is doing the talking. Who is it who's using these toxic terms? Are they coworkers, which is terrible, and management needs to deal with that? Or is it management itself? And Judge Rovner's opinion for the court in the Robinson case was pretty powerful on that point about using such hostile language to bully subordinates, humiliate them. And what worries me is, and I hope you'll be able to help me out on this, can we affirm here without writing an opinion that says the supervisor gets to use the N-word two or three times before there are any legal consequences? Yes, Your Honor. I understand your concern because I've thought about it as well. But these facts are different for the simple fact that plaintiff was allegedly subjected to these comments over the course of six months. But in this circuit, the hostile work environment, this circuit is imagining a work environment that's permeated with hostility. This plaintiff was the sole engineer at his school. He was the only person in his department. His supervisor was someone with whom he communicated with approximately three times a month. So the idea that this conduct impacted his work environment so severely is somewhat unimaginable because he was the only person there. Are you talking about Rivera? Excuse me? Rivera is the supervisor? Yes. And he's always somewhere else? Correct. That's why I was asking about encounters a while ago. Yes. He supervises approximately 16 locations. And so the engineers are supposed to work independently, and they usually interact with Mr. Rivera approximately three times a month. Additionally, plaintiff was actually only at work for approximately 11 days between November of 2013 and November of 2014. So it's not so much that calling someone the N-word is okay and appropriate, but we're looking at whether or not this created an environment that was severe or pervasive. So we should write an opinion that says it's okay if one out of four days your supervisor sees you? He uses that sort of language? No, but I think that we have to look at the totality of the circumstances. In the cases before this circuit, traditionally, in addition to the use of one or two racial epithets, there is also conduct by the supervisor that enhances the hostility of the work environment. In the Rogers case, the court there also looked at the fact that the supervisor regularly used non-race-based abuse. The plaintiff in that case had to work with his supervisor every single day, and they often worked 12-hour days. This is not the case for Plaintiff Gates. He rarely sees his supervisor, and he pretty much works on his own. Could the inference cut the other way on that, though? Excuse me? Could the inference cut the other way? The fact that you don't see your supervisor that often. When you do see your supervisor, it's a meaningful encounter, and if that meaningful encounter is polluted by entirely inappropriate racial comments, why couldn't that, or why couldn't you infer from that that it creates an awfully hostile environment? The only time I'm seeing my supervisor, he's, you know, lodging epithets. I think that that goes to the relationship that he has with his supervisor, rather than the environment in which he works. Seeing as how he's the only person who actually works in his department at the school. He doesn't interact with any of his supervisors, and there's no one else on his team. So I think that those two can be, I think that you can differentiate it in that way. Was he usually working on his own? Yes. So he doesn't have a supervisor most of the time. Correct. Most of the time he's on his own. Okay. Well, there, I get back to what I was asking about before, and that's his homicidal thought, where he took, I always find out, one month of getting therapy, I guess, because his homicidal thought was against Rivera. We believe that that goes to his subjective, to the subjective offensiveness of it. At the time that Mr. Rivera took a one-month leave, that was in December, he had recently received a 100% rating from his supervisor in June. He had the comment that was, there was an alleged comment made in September, and another one in November. We don't believe that two comments within that time period is severe or pervasive enough to cause someone to go on leave for a month, and that's why we believe it's actually the subjective offensiveness and not whether his environment was actually severe or pervasive in terms of hostility. I go back to that 11 days with November 2013 to November 2014. Yes. In one year period, he's worked 11 days. Correct. And when did these encounters with the bad language he used, was it during that period of time when he showed up 11 times? One of the comments was during that period of time. The others were previous to that? The others, I believe, yes, were previous to that. September 13th, November 19th, and March 19th, correct? Yes. So our position is just that within this circuit, while making three racially offensive comments over the course of the four years that he was at Goody, while they're offensive, they do not, without more, amount to creating a severe or pervasive. You've referred to this circuit. Do you think it's appropriate, that standard in this circuit, as compared to what other circuits are doing in the Supreme Court? I can't speak to that right now, Your Honor, but I would provide you with supplemental briefing if you would like. No. Thank you. And lastly, with regard to the retaliation claim, we ask that this court find that the claim be waived. As you all have already mentioned, there's no reference in plaintiff's brief to the district court of having suffered a hostile work environment as an adverse action in order to prove retaliation. There's actually no mention of a hostile work environment in the retaliation section at all, nor has plaintiff cited to any case law in any of his briefs to this court with regard to retaliation. So we ask that that claim be deemed waived. As far as the four leaves, are you familiar with those? The four leaves, yes. What was the worker's comp leave? Was there an injury? I believe he was injured at work the same day he was supposed to have a predisciplinary meeting with his supervisor. With Rivera? Yes. And he was injured? Yes. Did he fall down or something? I don't recall exactly what happened, but from that leave he didn't return until November. Yeah, okay. Then there was a military leave, apparently. Prior to that, yes. There was a one-week leave for his father's death and then the one-month leave. That was a family leave. Yes, and then the personal sick leave. Then there was the FMLA leave to take care of his grandfather. There was also the military leave and then the worker's comp. So I guess the medical leave is the one where he was working on that homicidal thought? Yes, in December. So let me just make sure I haven't missed this. Can you direct us to cases in this circuit, from this circuit, not district court cases, but cases where the evidence showed that a supervisor was directing this most toxic of racial slurs in our culture to subordinates, and we rejected those claims as a matter of law because the environment was not severe enough? Well, in the Nichols case, that plaintiff was actually referred to as an N-word. Yes, that was by a co-worker. I was on that too. Right now I'm having a difficult time coming up with that. I don't think they exist. Okay. Thank you. Okay. Anything else you want to tell us? That's it. You've got more time if you want. No, I think we'll rest for now. Thank you very much. Thank you. Ms. Galovich, any rebuttal? No. Just really quickly, Your Honors. I believe that the work injury was a fall off a ladder at work, and that's what kept him off of work for so long. And then in terms of the amount of time when the racial slurs were made, if you count from September to November 16th, and then an additional 11 days the following year, I mean, he was really only at work 10 weeks. So we have three racial slurs, pretty severe, in a 10-week period. So, I mean, I think it's worse than just saying six months. I mean, it's really just 10 weeks of being at work. Okay. Plaintiff also had his 100% rating around June, but there's something that is in the last case, the lower case, that if you've read the briefs and the motion for summary judgment, you may have learned that there was some sort of an iPad theft. Okay. And I think that all of this then kind of morphed into a problem between Rivera and the plaintiff. Was there some question of him being accused of taking them or something like that? The plaintiff believed that he was being accused by the principal and Mr. Rivera of taking iPads from a locked room because he had access. Could that be somebody else? Everybody who had a master key was treated as somebody to investigate, right? Yes, Your Honor. Okay. And it did turn out to be somebody else? I'm not entirely certain who it actually was, but it was not Mr. Gates. I know I've seen that somewhere in the briefs, but I couldn't tell you where. Yeah, it's referenced. And the environment, even if it was someone else, it's not your client, right, according to the record, and the environment didn't improve after that either, right? No, Your Honor, it did not improve. Anything further? No, Your Honor, we just ask that the court reverse the dismissal. All right. Thank you. Thank you very much. Thanks to all counsel. The case is taken under advisement.